233 N.J. Super. 336 (1989)
558 A.2d 1351
CEDAR COVE, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, AND THE STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, PLAINTIFF-INTERVENOR AND RESPONDENT,
v.
ALPHONSE STANZIONE, DEFENDANT-APPELLANT AND CROSS-RESPONDENT, AND BOROUGH OF SOUTH TOMS RIVER, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND PLANNING BOARD OF THE BOROUGH OF SOUTH TOMS RIVER, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 7, 1988.
Decided May 30, 1989.
*338 Before Judges DEIGHAN, BAIME and D'ANNUNZIO.
Irwin I. Kimmelman, argued the cause for appellant cross-respondent, Alphonse Stanzione (Kimmelman, Wolff & Samson, attorneys; Gage Andretta and Bruce Dickstein, on the brief).
George P. Cook, Deputy Attorney General, argued the cause for respondent intervenor Department of Environmental Protection (W. Cary Edwards, Attorney General, attorney; James J. Ciancia, Assistant Attorney General, of counsel; George P. Cook, on the brief).
Theodore E. Kyles, Jr., argued the cause for respondent cross-appellant, Cedar Cove (Enright, Lenney & Mcgrath, attorneys; Aaron Dines, of counsel; Theodore E. Kyles, Jr., on the brief).
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.,
Defendant, Alphonse Stanzione (Stanzione), appeals from a judgment voiding a sale to him of public lands owned by the Borough of South Toms River (borough). To decide this appeal we must construe N.J.S.A. 13:8A-47(b) (hereinafter § 47(b)), which restricts municipal power to sell lands held for recreation and conservation purposes at the time a municipality receives a *339 grant under the New Jersey Green Acres Land Acquisition and Recreation Opportunities Act (hereinafter Green Acres or the Act), N.J.S.A. 13:8A-36 et seq.
Plaintiff, Cedar Cove, cross-appeals from that part of the judgment which rejected its contention that Stanzione had a conflict of interest which voided the sale.
The material facts are not in dispute. The trial judge's findings of fact are supported by substantial credible evidence in the record. Rova Farms Resort v. Investors, Ins. Co., 65 N.J. 474, 484 (1974).
In 1935, the borough acquired a tract of riverfront property from the State, consisting of lots 1, 2, 3 and 4 in Block 3. The tract became known as Mathis Plaza. Use of the lots was unrestricted. Thereafter, the borough leased lots 2 and 4 to private interests for commercial purposes, leaving lots 1 and 3 vacant. The trial judge found that lot 3 had been used for recreational purposes. These recreational uses included fishing and docking of boats for which the borough exacted a small fee. Benches, tables and charcoal grills were available on lot 3 for picnicking, and by 1962 lot 3 contained a war memorial. Lot 3 also was used occasionally as a circus and carnival site.
Lot 3's use as a park continued through 1978. In January, 1977 the borough applied for a Green Acres grant of $27,500 to develop ballfields in another part of the municipality. The borough received the grant in 1978. There is no evidence that lot 3 had been used as a ballfield.
As part of the Green Acres application process, the borough completed a form entitled Recreation and Open Space Inventory. On this form the borough listed five "Developed Park and Recreation Areas." No property was listed in the inventory section titled "Undeveloped Lands owned by Local Unit and Designated for Open Space, Recreation or Conservation Purposes." Lot 3 was not listed as part of the inventory.
In 1984, the borough, pursuant to N.J.S.A. 40A:12-13, advertised the tract, including lot 3, for sale at public auction. *340 Stanzione was the only bidder. Cedar Cove, a New Jersey corporation with offices in the borough, commenced this action in lieu of prerogative writs to set aside the sale. In its complaint, Cedar Cove contended, inter alia, that § 47(b) prohibited the sale of lot 3 and that a conflict of interest existed in that Stanzione was in private law practice with his brother, Richard, who was the borough's planning board attorney. Prior to trial, the State, by its Department of Environmental Protection (DEP), was allowed to intervene as a plaintiff. After trial, the trial judge found that no conflict of interest existed but that the sale was barred by § 47(b).
N.J.S.A. 13:8A-47(b) provides:
A local unit which receives a grant under this act shall not dispose of or divert to a use for other than recreation and conservation purposes any lands held by such local unit for such purposes at the time of receipt of said grant without the approval of the commissioner and the State House Commission and following a public hearing by the local unit at least 1 month prior to any such approvals.
Thus, all lands held by the borough for recreation and conservation purposes in 1978[1] when the borough received the Green Acres ballfield grant cannot be sold or otherwise diverted to other uses without State approval. The narrow issue, therefore, is whether lot 3 was "held by" the borough for recreation and conservation purposes when the borough received Green Acres money. We conclude that although lot 3 was being used for recreation purposes in 1978, it was not "held by" the borough for that purpose within the meaning of § 47(b).
In construing a statute we must give effect to the Legislature's intent. Monmouth County v. Wissell, 68 N.J. 35 (1975). Sources of legislative intent are the language of a statute, the policy behind a statute, concepts of reasonableness and legislative history. Shapiro v. Essex County Freeholders Board, 177 N.J. Super. 87 (Law Div. 1980), aff'd, 183 N.J. Super. 24 (App.Div. 1982), aff'd, 91 N.J. 430 (1982). Moreover, "statutes *341 are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as `consonant to reason and good discretion.'" Schierstead v. Brigantine, 29 N.J. 220, 230 (1959) (citations omitted). And "where a literal reading of the statute leads to absurd consequences `the court must restrain the words' and seek the true legislative intent." Id. at 231, quoting In re Merrill, 88 N.J. Eq. 261 (Prerog. Ct. 1917). In construing a statute we assume that the Legislature intended a reasonable approach, and we should construe a statute to effect a reasonable approach, Roman v. Sharper, 53 N.J. 338, 341 (1969), not one "at odds with the sense of the situation." Id. at 340.
Green Acres legislation expresses and implements the public policy of adding to the State's inventory of recreational and conservation lands. N.J.S.A. 13:8A-36. Section 47(b) furthers this policy by preventing a municipality from selling or otherwise disposing of pre-existing recreation lands for which it has substituted Green Acres lands at State expense. See Kauffman v. No. Haledon Bor., 229 N.J. Super. 349 (Law Div. 1988); Borough of Demarest v. State, 148 N.J. Super. 322 (Ch.Div. 1977). There were no statutory restrictions on diversion of pre-existing recreation lands prior to enactment of § 47(b) which was adopted as part of the 1975 Green Acres Act.[2]L. 1975, c. 155, § 1 et seq. However, beginning with the first Green Acres Act in 1961, L. 1961, c. 45, § 1 et seq., DEP has included in its local grant contracts an undertaking by the local government grantee that it will not divert to other uses lands "now used for recreation or conservation" without the approval of DEP and the State House Commission. Borough of Demarest, supra at 325. Regulations governing Green Acres grants also restrict diversion. N.J.A.C. 7:36-1.8(k) provides:

*342 Upon receipt of an acquisition or development loan or grant, other lands owned, dedicated or maintained for public recreation or conservation purposes by the local unit may not be diverted or disposed of for uses other than those of public recreation or conservation without the prior approval of the Commissioner and the State House Commission.
We note, however, that the Legislature deviated from DEP's contract language and from the regulation's language when it enacted § 47(b). Thus, § 47(b) restricts only those lands "held by such local unit for such purposes."
Citing Smith v. Gaines, 39 N.J. Eq. 545, 547 (E. & A. 1885) and Wasser & Winters Co. v. Jefferson County, 84 Wash.2d 597, 528 P.2d 471 (Wash. 1974), DEP contends that the word "held" denotes present, possessory ownership. We believe, however, that this construction of "held" begs the question, which we deem to be whether mere use of property for recreation and conservation triggers the restriction, as the trial court held, or whether § 47(b) requires something more than use.
We are satisfied that the statute requires more than use of property for recreation or conservation purposes. We are persuaded to that view because mere use as a predicate of § 47(b)'s applicability can unduly impact municipal land management and titles.
N.J.S.A. 13:8A-37(f) defines recreation and conservation purposes as follows:
"Recreation and conservation purposes" means use of lands for parks, natural areas, historic areas, forests, camping, fishing, water reserves, wildlife, reservoirs, hunting, boating, winter sports and similar uses for either public outdoor recreation or conservation of natural resources, or both. [Emphasis added.]
We have underlined those uses in the definition which are passive, i.e., they can exist on municipal lands in the absence of municipal action or encouragement. Thus, idle municipal lands which are wooded but otherwise undeveloped could be deemed in "use ... for ... natural areas ... forests ... water reserves, wildlife...." Similarly, public use of vacant municipal lands for sporting activities, acquiesced in or supported by municipal authorities, would jeopardize municipal control of those lands if DEP's contention prevails.
*343 The Act's objective is the addition of recreation and conservation lands to the public inventory, to be accomplished in part through grants to local units. N.J.S.A. 13:8A-38. If mere active or passive use of municipal lands triggers § 47(b) restrictions, municipalities may avoid Green Acres funding or prevent the temporary use of undeveloped municipal land for recreation or conservation purposes. We are satisfied that the Legislature did not intend a construction of § 47(b) which would tend to defeat the Act's objective.
We conclude, therefore, that § 47(b) applies only to those lands used or reserved for recreation and conservation purposes by a local unit with a municipal resolve permanently to devote the lands to those uses. To limit the difficulties we identified previously and to limit § 47(b)'s adverse impact on municipal land titles, we conclude that § 47(b) requires a showing of more than active or passive use. We do not reject long-term use as circumstantial evidence of municipal resolve or intent. The longer the use the stronger the inference, especially if the local unit actively participated in or supported the use. However, long-term passive uses, such as long-term municipal ownership of a forest, standing alone, would not necessarily be sufficient to establish the requisite municipal intent. Even long-term active use would not support a finding of the requisite intent if the municipal record is otherwise inconsistent with that intent.
In the present case, the record is mixed. Lots 2 and 4 were commercially developed in the 1930s as gasoline stations. Currently there is a gasoline station on lot 2 and a retail glass store on lot 4. Although lot 3, as previously indicated, has been utilized as a recreational area, the record establishes that as early as 1961 the borough council was attempting to return the entire tract, including Lot 3, to the tax rolls by leasing it to the private sector. On June 12, 1961, the borough council adopted a motion "that a For Lease sign be erected on Mathis Plaza." The minutes of the August 28, 1961 council meeting reflect a request by the then-mayor "that bids on the Mathis Plaza be held off until such time as he is able to look over plans." The *344 same minutes reflect the filing of a petition with the council requesting that the lease of Mathis Plaza be placed on the general election ballot. At its August 13, 1962 meeting, the council adopted a resolution placing the Mathis Plaza question on the ballot. The record does not indicate whether the question was indeed placed on the ballot in November 1962 or, if so, the result of the vote. However, on July 8, 1963, the council adopted a motion to hire a real estate consultant "in regards to the leasing of Mathis Plaza...." One year later, on August 10, 1964, the council adopted a motion to advertise "in regards to the leasing of Mathis Plaza." The minutes of an October 15, 1964 special meeting established that the council held for further study a bid for Mathis Plaza from Nassau Marine. The bid contained no price and was for the use of Mathis Plaza for parking in conjunction with the docking of "a steam operated passenger vessel...."
Thereafter, the record is silent until November 12, 1973, when the council voted to obtain a re-appraisal of Mathis Plaza. On February 11, 1974, the following resolution was adopted:
WHEREAS, it is the desire of the Mayor and Council to secure the highest and best use for this property under the terms of a long term lease agreement entered into with a tenant willing to erect thereon an improvement for a cost of not less than $1,000,000.00;
NOW THEREFORE, BE IT RESOLVED by the Mayor and Council of the Borough of South Toms River, County of Ocean and State of New Jersey, that the Borough advertise for bids for the lease of Lots 1, 3 and 4 in Block 3, Borough of South Toms River, County of Ocean and State of New Jersey, for a term of thirty (30) years on a net net basis with a gross rental of $850,000 (tenant paying all real estate taxes and insurance premiums and constructing improvements for a cost of not less than $1,000,000.00 including a liability policy of not less than $1,000,000.00) with an additional twenty (20) year option. Said invitation to bid shall recommend as a highest and best use for the property, a marina, boatel, motel, restaurant, condominium townhouse complex or multi-family highrise; and
BE IT FURTHER RESOLVED, that the governing body shall have the right to reject all bids where the highest bid is not accepted; and
BE IT FURTHER RESOLVED, that the governing body may enter into a thirty (30) year lease with a twenty (20) year option to renew for Lots 1, 3 and 4 in Block 3, Borough of South Toms River, County of Ocean, State of New Jersey.
*345 Thus, three years before the Green Acres application the council, consistent with its earlier efforts, was attempting to return Mathis Plaza, including lot 3, to the private sector for what the council considered to be the property's highest and best use, a site for commercial development.
The council's attempts to foster the commercial development of Mathis Plaza were consistent with the borough's land use plan. The 1971 Master Plan's community facilities element excluded Mathis Plaza from lands designated as parks and playgrounds. In the land use element, Mathis Plaza was placed in the Special Economic Development zone, although other lands were described as public/conservation.
In 1972, the official map designated seven tracts for playgrounds, parks or conservation lands. Mathis Plaza was excluded from these designations.
Consistent with the Master Plan, the 1972 zoning ordinance placed Mathis Plaza in the Special Economic Development (SED) zone which permitted "offices for business and professional uses, research laboratories, retail uses permitted in the B-1 zone, and garden apartment developments...." Mathis Plaza continued to be zoned SED when the borough received the Green Acres grant.
The borough's exclusion of Mathis Plaza from the Green Acres' Recreation and Open Space Inventory was consistent with the municipal intent eventually to convert Mathis Plaza to commercial development. Although a local unit's failure to include a tract in the inventory is not a conclusive bar to § 47(b)'s applicability, it is highly probative of municipal intent when accompanied by other indicia of that intent.
Although lot 3 was being utilized as recreation lands, the borough's attempts to lease the tract to the private sector coupled with the treatment of Mathis Plaza in the master plan, the zoning ordinance and on the official map, belie a municipal resolve to permanently devote lot 3 to recreation or conservation *346 uses. We conclude, therefore, that § 47(b) does not restrict the borough's disposition of lot 3.
We also conclude that DEP cannot restrict disposition of municipal lands by regulation, N.J.A.C. 7:36-1.8(k), or by contract, on a lesser showing than is required by § 47(b). Cf. N.J. Chamber of Commerce v. N.J. Elec. Law Enforce. Comm., 82 N.J. 57, 82 (1980) ("[a]dministrative regulations, of course, cannot alter the terms of a legislative enactment or frustrate the policy embodied in the statute"); Foreign Auto Prep. S. v. N.J. Economic D. Auth., 201 N.J. Super. 428, 433 (App.Div. 1985) ("[r]egulations to implement statutory entitlements cannot exceed the authority of the legislative grant"). As previously indicated, § 47(b) is the first expression of legislative intent to restrict municipal disposition of pre-existing recreation and conservation lands in connection with the Green Acres program. In doing so, the Legislature avoided DEP's regulatory and contract language in favor of the narrower phrase "held by such local unit for such purposes." But cf. Kauffman v. No. Haledon Bor. and Borough of Demarest v. State, both cited supra, which relied in part on DEP contract language in restricting diversion of municipal parklands.
We agree with the trial court's determination that plaintiff failed to establish a conflict of interest which would void the sale. Alphonse Stanzione, the purchaser, is the brother of Richard Stanzione, the borough's planning board attorney. He was also Richard Stanzione's law partner. The sale was authorized by the council not by the planning board. Moreover, neither Stanzione brother sat as a voting member of the planning board or the council, and neither represented the council at the time of the sale. The cases cited by plaintiff are inapposite. They involved conflicts affecting voting members of municipal governing bodies. Griggs v. Princeton Borough, 33 N.J. 207 (1960); Aldom v. Bor. of Roseland, 42 N.J. Super. 495 (App. Div. 1956); Netluch v. Mayor and Council of West Paterson, *347 130 N.J. Super. 104 (Law Div. 1974); Tp. Committee, Hazlet v. Morales, 119 N.J. Super. 29 (Law Div. 1972).
Plaintiff also relied on Bd. of Ed. of W.O. v. Intern. Union Eng., 109 N.J. Super. 116 (App.Div. 1970). But that decision is also inapposite. It held that an attorney who sat as a member of the Public Employment Relations Commission should not have participated in a matter involving his law firm's client.
Paragraph one of the judgment which invalidated the sale is reversed. That part of the judgment, paragraph 2(a), declaring the absence of a conflict of interest is affirmed.[3]
NOTES
[1] We do not decide whether the phrase "at the time of receipt of said grant" refers back to the application date because that issue is not before us.
[2] The New Jersey Green Acres Land Acquisition Act of 1961 restricted diversion of lands acquired with the aid of a Green Acres grant. L. 1961, c. 45, § 13; N.J.S.A. 13:8A-13.
[3] Paragraphs 2(b) and (c) of the judgment are not at issue.

In the trial court Cedar Cove contended that the sale did not comply with N.J.S.A. 40A:12-13(a), particulary with regard to the legal sufficiency of the required public notice. The trial judge rejected these contentions, and Cedar Cove has not advanced them as part of its cross-appeal.